Bernard SAMOFF, Regional Director of the Fourth Region of the National Labor Relations Board, for and on behalf of the **NATIONAL LABOR RELATIONS BOARD**, Petitioner

v.

**WILLIAMSPORT BUILDING AND CONSTRUCTION TRADES COUNCIL, AFL–CIO, and Local 812, International Brotherhood of Electrical Workers, AFL–CIO**, Respondents.

Civ. No. 70–140.

United States District Court,
M. D. Pennsylvania.

May 25, 1970.

Harold Bernard, Jr., Joseph J. Mahon, Jr., Philadelphia, Pa., Counsel for NLRB, Region 4, for petitioner.

Michael Brodie, Philadelphia, Pa., Sidney Simon, Williamsport, Pa., for respondents.

McNerney, Page, Vanderlin & Hall, by William R. Tait, Jr., Charles J. McKelvey, Williamsport, Pa., for Sardec, Inc.

## OPINION AND ORDER

HERMAN, District Judge.

The petitioner, Bernard Samoff, Regional Director of the Fourth Region of the National Labor Relations Board, for and on behalf of the National Labor Relations Board (hereinafter Board), seeks a preliminary injunction pursuant to Section 10($l$) of the National Labor Relations Act, as amended by 73 Stat. 544 (1959), 29 U.S.C. § 160($l$). Petitioner alleges that charges levied against respondents are pending before the Board claiming that the respondents have engaged in, and are engaging in acts and conduct in violation of § 8(b) (4) (i) and (ii), subparagraph (B) of the National Labor Relations Act, and that petitioner has reasonable cause to believe that the said charges are true.

It appears from the record that on October 22, 1969 and on the subsequent dates of December 8, 1969 and March 16, 1970, Sardec, Inc., filed charges with the Board alleging that the respondents have engaged in and are engaging in unfair labor practices within the meaning of § 8(b) (4) (i) and (ii), subparagraph (B) of the act. The applicable portions of said act read as follows:

"(b) It shall be an unfair labor practice for a labor organization or its agents * * * (4) (i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is: (B) forcing or requiring any person to cease using, selling, handling, transporting or otherwise dealing in the products of any other producer, processor or manu-

facturer, or to cease doing business with any other person; * * *."

The petition seeking injunctive relief, was filed in this court on April 9, 1970 and the court ordered that a hearing be held on April 24, 1970.

On April 17, 1970 respondents filed a notice of taking of depositions of petitioner Bernard Samoff, pursuant to Rule 26 of the Federal Rules of Civil Procedure. The notice set April 21, 1970 as the date for the taking of depositions and in addition provided, "You are hereby notified to produce the Petitioner, together with such documents in his file as he believes support the allegation of the petition that the Petitioner has reasonable cause to believe that Respondents have violated Section 8(b) (4) (i) and (ii), subparagraph (B) of the National Labor Relations Act as amended."

Attendance had not been compelled by use of subpoena, nor had there been a subpoena issued to compel the production of documents as provided for under Rule 45(a) and (b) of the Federal Rules of Civil Procedure. Petitioner, however, appeared as requested by respondents' notice.

During the taking of depositions, petitioner, upon advice of his counsel, refused to answer a number of questions propounded to him by respondents' counsel. Respondents, thereafter, on April 23, 1970 the day before the scheduled hearing on the petition, filed with the court a motion entitled, "Application For Order Under Rule 37(a) of F.R.C.P." Therein respondents sought an order from the court compelling petitioner to answer certain questions, and additionally sought a stay of the preliminary injunction proceedings. The motion was argued orally before the court on April 24, and the court took the matter under advisement and reserved decision thereon.

The injunction hearing proceeded on Monday, April 27, when petitioner presented his entire side of the case. The matter was then continued to May 1 when respondents, having thus had three additional days to prepare their defense after having been fully advised of all of the matters they sought by deposition, presented their testimony.

The court will consider the procedural and privilege issues raised by the motion prior to a discussion of the merits of the § 10($l$) relief sought by the petitioner.

The issues before the court arising out of the Rule 37(a) motion are whether or not the discovery provisions of the Federal Rules of Civil Procedure are applicable to § 10($l$) proceedings of the National Labor Relations Act, as amended; if the discovery provisions are applicable whether or not the "Freedom of Information Act," 5 U.S.C. § 552 and the National Labor Relations Board's claim of executive privilege bar discovery of the NLRB's investigations; and whether by notice of taking oral depositions without subpoena respondents may compel the production of documents sought in the notice.

The implementing Rule 1 of the Federal Rules provides that the rules govern the procedure in "all suits of a civil nature" except those exempted by Rule 81.

Rule 81(a) (5) provides: "These rules do not alter the practice in the United States district courts prescribed in the Act of July 5, 1935, c. 372, §§ 9 and 10 (49 Stat. 453), as amended, U.S.C., Title 29, §§ 159 and 160, for beginning and conducting proceedings to enforce orders of the National Labor Relations Board; and in respects not covered by those statutes, the practice in the district courts shall conform to these rules *so far as applicable*." (Emphasis supplied.)

Section 10($l$) of the act, 29 U.S.C. § 160, the act under which these proceedings are brought, provides that, "Upon filing of any such petition the courts shall cause notice thereof to be served upon any person involved in the charge and such person, including the charging party, shall be given an opportunity to appear by counsel and present any relevant testimony." The act further establishes, under 29 U.S.C. § 160(i), that, "Petitions filed under this subchapter shall be heard expeditiously, and if pos-

sible within ten days after they have been docketed." [1]

No express mandate is made either limiting or making applicable the discovery procedures of the Federal Rules in subsection (*l*) of the act although a sense of urgency is expressed in that the hearing is to be held within ten days, or as soon as possible, and that cases filed under subsection (*l*) are to be given priority over all other cases except those in the same class in the NLRB office where filed. 29 U.S.C. § 160(m).

■ The court agrees with respondents that the discovery procedures of the Federal Rules are not absolutely precluded by reason of the preliminary, yet permanent nature of an injunctive proceeding, pursuant to 29 U.S.C. § 160 (*l*), and the limited function of the court in determining whether or not an injunction shall be issued against the respondents.

Though many of the reasons advanced as to the benefits of the discovery procedure, such as the prevention of delays, the expedition of the trial and the examination of the witness while his memory is fresh are inappropriate under subsection (*l*) proceedings, respondents have the right under the rules to be apprised of the factual allegations claimed giving rise to petitioner's "reasonable cause to believe" that a violation of the act has been committed in order to adequately prepare for the hearing on the petition. In the event discovery questions do arise under subsection (*l*) proceedings, the court should properly balance the objectives of discovery procedure; the function of the court in a subsection (*l*) proceeding; and the objectives of the act.

Assuming the applicability of the rules, the question then arises whether or not respondents, upon notice of deposition without subpoena, may compel the production of the files of the Regional Director for purposes of discovery. In Rule 26(b) it is provided that, "the deponent may be examined regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action, whether it relates to the claim or defense of the examining party or to the claim or defense of any other party, including the existence, description, nature, custody, condition and location of any books, documents, or other tangible things and the identity and location of persons having knowledge of relevant facts."

■■ A deponent examined pursuant to Rule 26 is compelled to disclose the "existence, description, nature, custody, condition and location of any books, documents, or other tangible things," but he is not compelled to produce them pursuant to an oral demand. Bank of America Nat. Trust & Savings Ass'n v. Loew's Internat. Corp., 18 F.R.D. 491 (D.C.N.Y. 1956); Chemical Specialties Co. v. Ciba Pharmaceutical Prod., Inc., 10 F.R.D. 500 (D.C.N.J.1950). A deposition notice alone does not compel the production of documents and even if a subpoena duces tecum had been issued pursuant to Rule 45(b) the deposing party may not circumvent the "good cause" requirements of Rule 34 and shift the burden on the deponent to quash the subpoena. Shenker v. United States, 25 F.R.D. 96 (D.C.N.Y.1960); Deep South Oil Co. of Texas v. Metropolitan Life Ins. Co., 21 F.R.D. 340 (D.C.N.Y.1958).

■ In consequence all of respondents' objections raised as to the failure of petitioner to produce the documents called for in the notice of depositions are hereby dismissed.

The "executive privilege" argument raised by counsel for the government has questionable applicability. There has been no assertion of privilege by the General Counsel for the National Labor Relations Board as suggested by United States v. Reynolds, 345 U.S. 1, 73 S.Ct. 528, 97 L.Ed. 727 (1953), and Cooney v. Sun Shipbuilding & Drydock Co., D. C., 288 F.Supp. 708 (1968). In addition, the government failed to raise the

---

1. Because of previously scheduled criminal and civil trials it was impossible to hold the hearing in this matter prior to April 24, 1970.

question of the "Freedom of Information Act," Pub.L. 89–554, 80 Stat. 383 (1966), 5 U.S.C. § 552, as amended; Cooney v. Sun Shipbuilding & Drydock Co., *supra*. Nevertheless, these questions are moot since no compulsion existed to produce the files.

Counsel for the NLRB went to the deposition hearing prepared to release the names of witnesses intended to be introduced at the hearing on the petition. The petition filed by the government had sufficient clarity upon which respondents could have prepared an adequate defense. Respondents heard all of the petitioner's testimony and their counsel fully cross-examined petitioner's witnesses three days before they were obliged to defend the case. In consequence, the court concludes that sufficient discovery had been made available to the respondents, and considering the necessity of expeditious proceedings, no further discovery was necessary. Respondents' motion to compel answers in oral depositions filed April 21, 1970, will be denied.

After a full hearing on the merits of the petition; consideration of briefs of counsel, and being fully informed the court makes the following:

### FINDINGS OF FACT

1. The petitioner is Regional Director of the Fourth Region of the National Labor Relations Board, an agency of the United States, and has filed the petition on behalf of the Board.

2. On or about October 22, 1969, December 22, 1969, March 16, 1960, and April 8, 1970, Sardec, Inc., a general contractor (hereinafter Sardec) filed charges, and subsequently amended charges alleging that Williamsport Building and Construction Trades Council, AFL–CIO, and Local 810, International Brotherhood of Electrical Workers, AFL–CIO (later identified and stipulated as Local 812), respondents herein, have engaged in and are engaging in unfair labor practices as defined by § 8(b) (4) (i) and (ii), subparagraph (B) of the National Labor Relations Act, 29 U.S.C. A., § 158(b) (4) (i), (ii) (B).

3. Respondent Williamsport Building and Construction Trades Council is an unincorporated organization or association of craft unions of the building and construction trade, and is a labor organization.

4. Respondent Local 812, International Brotherhood of Electrical Workers is a labor organization.

5. The charges, and subsequently amended charges, being Case No. 4–CC–543 were referred to the petitioner in his capacity as Regional Director of the Fourth Region.

6. Respondent Williamsport Building and Trades Council (hereinafter Council) is an unincorporated organization in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work. Respondent Council is a collective body of affiliated labor organizations being local craft unions in the building and construction industry, and at all times material herein has acted as agent for said labor organizations.

7. Respondent Local 812, an unincorporated association, is a labor organization in which employees participate and which exists for the purpose, in whole or in part, of dealing with employees concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work. Respondent Local 812 is one of the affiliated labor or craft organizations having membership in the Council.

8. The principal offices of the respondents are maintained in Williamsport, Pennsylvania, and the respondents at all times material herein, have engaged in activities in transacting business and in promoting and protecting the interests of their affiliated labor organizations and their employee members.

9. Sardec, Inc., a general contractor, whose office is located in Williamsport, Pennsylvania, is engaged in the construction of commercial and industrial buildings. In the conduct of its business

Sardec annually purchases goods and materials valued in excess of $50,000 from suppliers or distributors outside of the State.

10. There is, and petitioner has reasonable cause to believe that:

(a) John Engle in his capacity as President of the Council has acted as an agent of respondent Council, and has also acted as an agent of respondent Local 812, an affiliate of the Council, at all times material herein.

(b) Warren Dieffenderfer, as business agent of respondent Local 812, has acted as an agent of respondent Local 812, and has also acted as an agent of respondent Council at times material herein.

(c) Sardec, Inc., a general contractor, in conjunction with Eck Realty, a real estate corporation, has been and is engaged in the building of new supermarkets for the Great Atlantic and Pacific Tea Company (hereinafter A&P) and F. M. Flickinger, Inc., t/a Super Duper Market (hereinafter Flickinger).

(d) Sardec has been and is engaged in the building of a Shopping Center in Williamsport, Pennsylvania, at Hepburn Street, for the A&P and has been and is engaged in the building of a Shopping Center in Mansfield, Pennsylvania, for Flickinger (hereinafter the Mansfield job).

(e) At the Hepburn job Sardec has subcontracted the brickwork and masonry work to Carl Roupp (hereinafter Roupp), the concrete work to Frank Wolyneic and Sons (hereinafter Wolyneic), the ceilings and floors to Standard Accoustical (hereinafter Standard), the painting to Frank Stetts (hereinafter Stetts), the electrical work to Gene Hollick (hereinafter Hollick), an individual enterprise, and the carpentry work to Max Lucas. A&P has subcontracted certain fixture installation work to Shamokin Lumber, Inc. (hereinafter Shamokin). At all times material herein Sardec, the general contractor, had no employees.

(f) At the Mansfield job Sardec has subcontracted electrical work to Hollick, and at the same time Flickinger has subcontracted refrigeration work to Bascaglia Company (hereinafter Bascaglia), and sprinkler installation to Sandberg Company (hereinafter Sandberg).

(g) From on or about October 18, 1969 to and including December 22, 1969, and from March 12, 1970 continuing to date of the hearing on the preliminary injunction, respondent Council has been engaged in picketing the Hepburn job.

(h) On or about the date of October 15, 1969, aforesaid respondent Council picketed and distributed handbills at operating A&P stores located in the Williamsport area, asking customers of A&P to refrain from purchasing from A&P stores for the alleged reason that A&P was having a store built at the Hepburn Street Redevelopment with non-union contractors, and said conduct continued on various dates up to early November 1969.

(i) At all times material herein, the picketing and other related activity, as set forth in Finding 6(g) above, has had as an object the forcing and requiring of Shamokin and other subcontractors and suppliers to cease doing business with Sardec, and the forcing and requiring of Sardec to cease doing business with Roupp.

(j) At all times material herein, the picketing, distributing of handbills and other related activity, as set forth above in 6(g) and (h), has had as an object the forcing and requiring of A&P to cease doing business with Sardec in conjunction with Eck Realty, and the forcing and requiring of Sardec to cease doing business with Roupp.

(k) On or about December 29, 1969, Engle, President of Council, and Dieffenderfer, Business Agent of Local 812, entered the Mansfield project and told Bascaglia employees that the Mansfield job would be picketed.

(l) On or about March 9, 1970 a picket appeared at the Mansfield job

and continued picketing there at various intervals up to and including April 3, 1970.

(m) The said picket carried a sign which read, in part, that Gene Hollick, electrical contractor, was not affiliated with IBEW Local Union No. 812 and was paying substandard wages. The said picket continued picketing the Mansfield job after he and Engle and Dieffenderfer had been advised that Hollick had left the job.

(n) On or about March 16, 1970, at the Mansfield job, Engle appeared at the job site and advised Sandberg's employees that they should not work behind the line.

(o) At all times material herein the acts and conduct described above in Findings 6(k), (l), (m), and (n), have had as an object the forcing and requiring of Sandberg, Bascaglia, and Flickinger to cease doing business with Sardec, and of forcing and requiring of Sardec to cease doing business with Hollick.

(p) At all times hereinabove noted in Findings 6(k), (l), (m), and (n), Council through its agent Engle, and Local through its agent Dieffenderfer and through their concerted acts have had as an object the forcing and requiring of Sandberg, Bascaglia, and Flickinger to cease doing business with Sardec, and of forcing and requiring of Sardec to cease doing business with Hollick.

(q) Council in pursuance of its acts, as found hereinabove, and in fulfillment of its object of forcing and requiring subcontractors and suppliers to cease doing business with Sardec, and the forcing and requiring of Sardec to cease doing business with Roupp and with Hollick has shifted its emphasis by changing picket signs from containing a complaint against Sardec to complaints against Hollick, or Roupp, while maintaining as an object thereof the forcing and requiring subcontractors and suppliers to cease doing business with Sardec, and the forcing and requiring of

Sardec to cease doing business with Roupp and with Hollick.

(r) Council by its acts hereinabove set forth has induced and encouraged individuals employed by Shamokin, Bascaglia, Sandberg, and other persons engaged in commerce or in an industry affecting commerce, to engage in a strike or a refusal in the course of their employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities, or to perform any services for Sardec.

(s) By its acts hereinabove set forth respondent Council has threatened, coerced, and restrained Sardec, A&P, Shamokin, Bascaglia, Flickinger, and Sandberg, and other persons engaged in commerce or in an industry affecting commerce with the object thereof to force or require said parties to cease doing business with any other party.

(t) By its acts and conduct hereinabove set forth respondent Local 812 has induced the employees of Flickinger, Bascaglia, and Sandberg, and other persons engaged in commerce to engage in a strike or a refusal in the course of their employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities, or to perform any services for Sardec.

(u) Respondent Local by the acts set forth in Findings 6(k), (l), (m), (n), and (q) above, has threatened, coerced, and restrained Flickinger, Bascaglia, and Sandberg, and other persons engaged in commerce or in an industry affecting commerce with the object thereof to force or require said parties to cease doing business with any other party.

(v) Collectively, an object of the acts and conduct of respondent Trades Council set forth in Findings 6(f) through (s) above was, and is, to force and require A&P, Flickinger, Bascaglia, Shamokin, Sandberg, and other persons engaged in commerce or in an industry affecting commerce to cease using, handling, transporting, or otherwise dealing

in the products of, and to cease doing business with Sardec, and to force and require Sardec and other persons engaged in commerce or in an industry affecting commerce to cease using, handling, transporting, or otherwise dealing in the products of, and to cease doing business with Hollick and with Roupp.

(w) As set forth in Findings 6(k), (l), (m), (n), and (q) above, respondent Local 812 has as an object and is an object through the hereinabove related acts to force and require Flickinger, Bascaglia, Sandberg, and other persons engaged in commerce or in an industry affecting commerce to cease using, handling, transporting, or otherwise dealing in the products of, and to cease doing business with Sardec, and to force and require Sardec and other persons engaged in commerce or in an industry affecting commerce to cease using, handling, transporting, or otherwise dealing in the products of, or cease doing business with Hollick.

7. It may be fairly anticipated that unless enjoined pending determination of the Board respondents Council and Local 812 will continue and repeat the acts and conduct set forth in Findings 6(g) through (q) above, or similar acts and conduct.

### CONCLUSIONS OF LAW

1. This court has jurisdiction of the parties and of the subject matter of this proceeding, and under § 10(l) of the act is empowered to grant injunctive relief.

2. There is, and petitioner has reasonable cause to believe that respondent Council is a labor organization and acts as an agent of labor organizations within the meaning of §§ 2(5), 2(13), 8(b), and 10(l) of the act; and respondent Local is a labor organization within the meaning of §§ 2(5), 2(13), 8(b), and 10(l) of the act.

3. Sardec is engaged in commerce within the meaning of §§ 2(6) and 2(7) of the act.

4. There is, and petitioner has reasonable cause to believe that respondents

have engaged in unfair labor practices within the meaning of § 8(b) (4) (i) and (ii), subparagraph (B) of the act, affecting commerce within the meaning of §§ 2(6) and 2(7) of the act, and a continuation of these practices will impair the policies of the act as set forth in § 1, 29 U.S.C. § 141 thereof.

5. To preserve the issues for orderly determination as provided in the act, it is appropriate, just and proper that, pending the final disposition of the matters herein involved pending before the Board, respondent, its officers, agents, servants, employees, attorneys, and all persons in active concert or participation with it or them be enjoined and restrained from the commission or continuation of the acts, and conduct set forth in Findings of Fact 6(g) through (q) above, or acts or conduct in furtherance or support thereof, or like or related acts or conduct, the commission of which in the future may fairly be anticipated from respondents' acts and conduct in the past.

### DISCUSSION

■ The function of the court having jurisdiction of a 10(l) proceeding under the act is limited to a determination as to whether or not the Regional Director has reasonable cause to believe such charges as have been made by the charging party are true and that a complaint should issue, and whether the injunctive relief sought would be "just and proper" in terms of equitable principle. Schauffler v. Local 1291, Int'l Longshoremen's Ass'n, 292 F.2d 182 (3d Cir. 1961); McLeod on Behalf of N. L. R. B. v. Local 25, Int'l Bhd. of Elec. Wkrs., 344 F.2d 634 (2d Cir. 1965).

■ The court has no jurisdiction to determine the factual merits of the alleged unfair labor practice. Otherwise interpreted, the court in making its determination need not ascertain the credibility of the witnesses nor is it incumbent upon the courts to determine the truth or falsity of the facts alleged in the Director's petition. Schauffler v. Int'l Longshoremen's Ass'n, *supra.*

In 10(*l*) proceedings pursuant to the act, the Director has the burden to sustain the showing of "reasonable cause" as a requisite to the injunctive relief sought herein. "Reasonable cause" has been defined in earlier cases as those circumstances which would lead a reasonable person to believe that the facts alleged give rise to a violation of the National Labor Relations Act. Brown v. Nat'l Union of Marine Cooks & Stewards, 104 F.Supp. 685 (D.C.Cal. 1951). Subsequent to the earlier decisions under the act, the courts have variously construed the "reasonable cause" burden as one which requires the Regional Director to show that a "reasonable probability exists" that the facts alleged are true and a "reasonable possibility" that an unfair labor practice charge will be sustained against the respondents. McLeod on Behalf of N. L. R. B. v. Int'l Bhd. of Elec. Wkrs., *supra.*

In view of the limited scope of the court's function in this type of case; i. e., the determination of whether or not the Regional Director had reasonable cause to believe that the unfair labor practice charge is true, we hasten to point out that our Findings of Fact do not indicate in any way what the Labor Relations Board's ultimate fndings may be but are merely our findings of the "reasonably probable facts" upon which the Regional Director could fairly deduce, as he apparently did, that reasonable cause exists.

Sardec, a general contractor and the charging party, is engaged in the business of construction and building of Shopping Centers, and is currently the general contractor at two Shopping Center sites located in Mansfield, Pennsylvania, and Williamsport, Pennsylvania; the latter site referred to as the Hepburn job. From the testimony it may be deduced that Sardec has no employees actively engaged in the construction projects but subcontracts all of the phases of the construction to independent contractors.

At the Hepburn project, Sardec has subcontracted the various phases of construction to Hollick, an electrical contractor; Roupp, a mason contractor; Frank Wolyneic and Sons, concrete work; Standard Accoustical, ceilings and floors; and Frank Stetts, painting contractor. The Hepburn project is intended for the use of an A&P Food Store along with other chain stores and A&P has contracted for the installation of certain fixtures and equipment with Shamokin Lumber Company.

It appears also that at the Mansfield project, Sardec has subcontracted the construction work to Hollick, electrical contractor; Max Lucas, carpentry, and Todd and Roupp, masonry. In addition to the above, F. M. Flickinger Co. for which the Mansfield site was intended, has contracted with two other contractors, Sandberg Sprinkler Systems, and Bascaglia, refrigeration, who have no connection with Sardec.

As it appears in the charges lodged by Sardec, and found in the Findings of Facts, on or about October 18, 1969 several hundred men picketed the Hepburn project which has only two available entrances onto the site. The mass picketing resulted in a work stoppage on that date and scheduled deliveries were not made by interstate carriers. Picketing and handbilling activities were also conducted at numerous A&P food stores in the Williamsport area.

The mass picketing lasted approximately three hours and the number of pickets was thereafter reduced to two men who walked the perimeter of the job site. Handbilling activities at the A & P stores ceased in early or mid-November but the picketing at the job site continued to December 22, 1969. Initially the focus or thrust of the picket was directed against Sardec who was said to employ non-union employees, and the handbilling at the A&P stores sought to "inform" the public that A&P made use of non-union labor and maintained substandard conditions in the construction of their new food store.

The original charge lodged against the respondents was filed October 22, 1969, and on October 24, 1969 the placards used by the pickets were amended, as were the handbills distributed at the A&P food stores. The placards no longer assailed Sardec but were directed against Roupp, the masonry subcontractor.

Roupp, formerly of Todd and Roupp, Inc., with whom the respondents claim to have a grievance, began work on October 13 and continued until November 22, 1969, at which time he discontinued until December 28, 1969. The pickets continued their picketing from October 18, 1969 until December 22, 1969, at which time a tentative settlement was allegedly reached between the charging party and the respondents.

Work resumed at the Hepburn Street job after the settlement until March 12, 1970, when the pickets reappeared patrolling in front of the entranceways. Again the pickets focused on Roupp, but another amendment to the placard was allegedly made. Roupp worked at the site up to and including March 15, 1970. Subsequent thereto Roupp returned to the site only on April 7th and 8th to repair a wall. The picketing at the Hepburn job has continued to date of the last hearing on the within matter, May 1, 1970, at which time the respondents voluntarily agreed to cease picketing pending determination by the court.

In the interim period, to date, divers carriers have honored the picket, and Shamokin Lumber under contract with A&P, scheduled for work on March 16, 1970 has failed to work.

Picketing began sporadically at the Mansfield job site. The record indicates that on or about December 29, 1969, Engle and Dieffenderfer, representatives of the Building Trades Council, and Local 812, respectively, came on the job site. Engle allegedly spoke to members of the Bascaglia crew, a contractor for Flickinger, informing them that a picket was going to be put on the job site. In short, the Bascaglia men stopped work after a call was placed by Engle to their home office in New York.

The picketing at the Mansfield job was allegedly focused against Hollick, the electrical subcontractor. Hollick began his work at the site in late October and worked until March 27, 1970, at which time his work was completed. Hollick, however, was not on the site continuously, and the record indicates picketing occurred when Hollick was not on the site. It is admitted by respondent Local 812 that the picketing continued up to April 3, 1970 when it was discontinued

Additionally, petitioner produced testimony indicating that on March 16, 1970 Engle came on the job site and induced the crew of Sandberg, a Flickinger subcontractor, not to work behind the picket, resulting in a work stoppage. Testimony was also introduced inferring that Engle, rather than Dieffenderfer, established the picket at the Mansfield project. Commensurate with the picketing, work stoppages arose and deliveries were not made.

The petition charges respondents with a violation of § 8(b) (4) (B) of 29 U.S.C. which generally is intended to protect an employer from becoming enmeshed in union disputes not his own, or the "secondary boycott." The application of these principles becomes most difficult when dealing with picketing conducted at a construction site or a common situs. Madden v. Int'l Hod Carriers, 277 F.2d 688 (7th Cir. 1960).

As succinctly defined in Nat'l Woodwork Mfrs. Ass'n v. NLRB, 386 U.S. 612, 87 S.Ct. 1250, 18 L.Ed.2d 357 (1967), rehearing denied 387 U.S. 926, 87 S.Ct. 2026, 18 L.Ed.2d 985, a "secondary boycott" is the utilization of union pressure directed against a neutral employer intended to induce or coerce him to cease doing business with another employer with whom the union is engaged in a dispute. Essentially, the most difficult and crucial question involved herein is the "object" of the union activity. It is in the ascertainment of the union's object which is de-

terminative of whether the union is conducting a valid primary strike which indirectly affects the secondary employer or an unlawful "secondary boycott" whose purpose is to directly enmesh secondary employers in the dispute resulting in a cessation of business.

Questions involving "common situs" picketing accentuate the difficulty in ascertaining the object of the union. The Moore Dry Dock test developed by the National Labor Relations Board, and approved in Local 761, Int'l Union of Elec., Radio & Machine Wkrs., AFL–CIO v. Nat'l Labor Relations Board, 366 U.S. 667, 81 S.Ct. 1285, 6 L.Ed.2d 592 (1961), establishes a standard, even though flexible, whereby common situs picketing is presumptively valid when:

1.  the picketing is strictly limited to times when the situs of the dispute is located on the secondary employer's premises;

2.  at the time of the picketing the primary employer is engaged in his normal business at the situs;

3.  the picketing is limited to places reasonably close to the location of the situs;

4.  the picketing clearly discloses the dispute is with the primary employer.

As suggested by the Supreme Court, above in Local 761, Int'l Union of Elec., Radio & Machine Wkrs., AFL–CIO, the Moore Dry Dock test is not to be applied inflexibly; and the court concurs with the respondents that a strict adherence to the test would sanction a cat and mouse game between the union and the primary employer, if the respondents were required to cease picketing the site each time the primary employer shifts his work site while not having completed his phase of the project.

On the other hand, the court finds it reasonable for the Regional Director to infer that the respondents have conveniently shifted their emphasis to other primary employers while retaining their primary focus on Sardec, A&P, and Flickinger, and that the respondents have induced other secondary or neutral employees to honor the pickets.

These factors, coupled with the extended picket, give rise to a reasonable inference that the object of the picketing at the Hepburn and Mansfield job sites is to coerce neutral, secondary employers to cease doing business with the alleged primary employers, and other secondary employers.

The court additionally concludes that sufficient circumstantial evidence has been presented for the Regional Director to have reasonable cause to believe that an agency relationship exists between respondents and that the activities undertaken at the Mansfield project were the concerted acts of the respondents and not those of Local 812 alone.

For the reasons given, it is our opinion that petitioner has made out a case that there is reasonable cause to believe that respondents have engaged in and are engaging in, acts and conduct in violation of § 8(b) (4) (i) (ii), subparagraph (B) of the act, and that such acts and conduct will likely be repeated or continued unless enjoined. And the court considering the relief sought as being just and proper, an order will be entered granting the injunctive relief as prayed for by petitioner, pending the final adjudication by the Board with respect to such matter.